# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# AT LOUISVILLE

SAMUEL YENAWINE                                                            PETITIONER

v.                                                                    NO. 3:06-CV-413-R

JOHN MOTLEY, WARDEN                                                        RESPONDENT

## REPORT AND RECOMMENDATION

The petitioner, Samuel Yenawine, *pro se*, seeks a writ of habeas corpus under 28 U.S.C. § 2254 from state custody. The petitioner is serving an enhanced sentence of ten years' imprisonment as a persistent felony offender in connection with a conviction for wanton endangerment (four counts) and tampering with physical evidence. The respondent, John Motley, moves to dismiss the petition. The court referred this matter to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). For reasons set forth below, the magistrate judge will recommend granting a conditional writ.

## I.

1) On January 10, 2001, Louisville firefighters responded to a house fire and rescued Samuel Yenawine, his wife and three children from the roof over the front porch. The Yenawines lived on the second floor of the house and operated a business on the first level. Firefighters found the body of Brian Tinnell in the rear of the house, where he lived in an attached but separate apartment. They also found accelerants and a knife near the body. Investigators concluded the fire originated in Tinnell's apartment but that he died of knife wounds rather than by exposure to fire.[1]

---

[1] Appendix at 122-23 (hereinafter "App."), docket no. 13.

2) In short order, Yenawine was indicted for murder, arson and other charges. He voluntarily turned himself into police in Indiana and was extradited to Kentucky. Once in custody in Louisville, Yenawine gave the following recorded confession to homicide detectives, as recounted in an unpublished opinion of the Supreme Court of Kentucky:

> Yenawine told how he and the victim were in the apartment at the back of the building smoking marijuana on the night of the fire. Later that night ... Yenawine went upstairs to his bedroom where his wife was asleep. After about an hour or so, Yenawine heard floorboards creaking from the direction of his children's room. He went to investigate and saw Tinnell sneaking out of the room. Yenawine, afraid that Tinnell had molested his children, followed Tinnell downstairs to his apartment. When confronted, Tinnell came at Yenawine with a knife. A fight ensued, and Yenawine stabbed Tinnell six times, and slashed his throat.

Yenawine also described setting the blaze to destroy any evidence of the victim's body. He stated he then showered, returned to bed with his wife and fell asleep. After being awakened by his wife, Yenawine escaped with his family out the front window on the porch roof.[2]

3) A medical examiner testified that cuts on Yenawine's hands were consistent with defensive wounds or with having broken out glass from a window. The children did not corroborate Tinnell's presence in their room.[3]

4) In the state trial court proceedings, Yenawine moved to suppress his statement on grounds addressed later in this report. Although the trial court suppressed other evidence, the trial judge allowed the jury to hear Yenawine's recorded statement.

5) The jury acquitted Yenawine of murder but convicted him on the remaining charges: first-degree arson; tampering with physical evidence; four misdemeanor counts of wanton

---

[2]App. at 123-24.

[3]App. at 66, 124.

endangerment, second degree; and being a persistent felony offender, first degree. Yenawine was sentenced to life in prison for arson; five years for tampering; twelve months each count for wanton endangerment; and ten years for the persistent felony offense of tampering; all sentences to be served concurrently.[4]

6) Yenawine appealed to the Supreme Court of Kentucky, which reversed and remanded the arson conviction and affirmed the remaining convictions and sentences.[5] The Supreme Court of Kentucky held that Yenawine's statement that he intended to destroy evidence rather than to burn the building required the trial court to instruct the jury on third-degree arson.[6] A retrial on the arson charge has yet to occur. Thus, Yenawine is currently serving a ten year sentence exclusive of the pending arson charge.

7) Yenawine did not seek state collateral review but now seeks federal habeas review of the convictions affirmed on appeal.

## II.

### A. Standard of Review

1) The federal habeas statute, as amended in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides relief from a state conviction if the petition satisfies one of the following conditions:

> ... the [state court's] adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

---

[4]App. at 13-19.

[5]App. at 121.

[6]App. at 124-25.

>determined by the Supreme Court of the United States; or
>
>    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This statute further provides that state court determinations of fact are presumed to be correct. § 2254(e)(1).

2) The Supreme Court of the United States has taken care to distinguish federal habeas review from review on direct appeal, particularly when the state court articulates the correct legal rule in its review of a claim. In this situation a "federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams (Terry) v. Taylor*, 529 U.S. 362, 411 (2000).

3) In the same vein, a federal habeas court may not substitute its evaluation of the state evidentiary record for that of the state trial court unless the state determination is unreasonable. *Rice v. Collins*, 546 U.S. 333, 341-42 (2006) (stating, "Reasonable minds reviewing the record might disagree ... but on habeas review that does not suffice to supercede the trial court's credibility determination.").

**B. Exhaustion of State Remedies:**

4) The respondent argues the petitioner has failed to exhaust his state remedies because his case was remanded for retrial of the arson charge. Specifically, the respondent argues the third ground for relief is an unexhausted claim because it challenges the prosecutor's comments

during sentencing, which for the arson charge, remains reversed and non-final.[7]  The respondent argues the court should dismiss this action because it is a mixed petition.  The magistrate judge disagrees.

    5)   The exhaustion requirement is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims.  *Rose v. Lundy*, 455 U.S. 509, 519 (1982); *Silverburg v. Evitts*, 993 F.2d 124 (6th Cir. 1993).  The Supreme Court of Kentucky has been presented with the claims presented in this petition, claims that bear directly on the validity of the affirmed convictions apart from the reversed arson conviction.  The respondent fails to establish that the prosecutor's remarks, at issue in the third claim of the petition, relates exclusively to the reversed arson conviction; rather, the affirmed sentences stem from the same sentencing hearing on which the petitioner bases the third claim in the petition.

    6)   Therefore, the magistrate concludes that the petitioner has exhausted available state remedies for the claims asserted in this petition.

**C.  The Petition**

    7)   The petitioner argues the trial court improperly admitted his incriminating statements at trial because police detectives violated his *Miranda* rights during custodial interrogation.[8]  At issue, specifically, is whether the petitioner adequately and unequivocally asserted his right to be

---

[7] The respondent queries this court's order that he respond to the petition in a pleading that addresses not only affirmative defenses but also the merits of each claim, in accordance with Rule 4 of the Rules Governing § 2254 Cases, 28 U.S.C. following § 2254.  This pleading practice comports with § 2254(b)(2), which provides that a claim may be denied on the merits notwithstanding the failure of the petitioner to exhaust his available state remedies.

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

questioned only in the presence of counsel.

8) According to the majority opinion of the Supreme Court of Kentucky, the petitioner attempted to invoke his right to counsel with the statement, "I *might* need to speak with my lawyer about whether I should talk with you," followed with the petitioner handing them the business card of his wife's attorney, William Butler.[9]  Printed on the reverse side of attorney Butler's business card appeared the following:  "My lawyer has told me not to talk to anyone about my case, not to answer any questions and not to reply to any accusations.  Call my lawyer if you want to ask me any questions.  I do not agree to answer any question without my lawyer present. I do not agree to waive any of my constitutional rights."[10]

9) The Supreme Court of Kentucky reasoned, in a split decision, that under *Davis v. United States*, 512 U.S. 452, 462 (1994), the petitioner's timid, verbal request for counsel fell short of invoking *Miranda's* right to counsel during custodial interrogation.  Just as in *Davis*, the petitioner stated that he *might* want to speak with his lawyer.  On this basis, the majority reasoned, "Yenawine's statement was not the sort of 'unambiguous or unequivocal request for counsel' that would have required the police to stop questioning him."[11]  The majority concluded

---

[9] App. at 126.  According to the petitioner, however, both the petitioner's and attorney Butler's testimony at the suppression hearing established that on the day of the petitioner's interrogation, Mr. Butler considered himself as counsel for both the petitioner and his wife, while Mr. Butler resolved whether a conflict of interest existed.  The dissenting opinion of Kentucky's Chief Justice Lambert addresses this point.  (App. at 128-29.)  The respondent's brief further explains that five days prior to the petitioner's interrogation, Mr. Butler accompanied the petitioner's wife to the police station where she gave a statement implicating the petitioner of murder and arson.  (App. at 73.)  At that time, Mr. Butler advised police that he might have a conflict of interest.  (Id.)

Although the point requires clarification in this report, the magistrate judge's view is that this factual issue is a red herring:  Regardless whether on the date of his interrogation the petitioner was unrepresented by counsel or represented by Mr. Butler in particular, the issue remains whether the petitioner actually invoked his right to the presence of counsel during further custodial interrogation.

[10] App. at 129.

[11] App. at 126.

that the trial court correctly held that the petitioner failed to make a direct request for counsel and properly admitted the taped confession for the jury's hearing.

10) The petitioner argues the Supreme Court of Kentucky wrongly decided this issue because he not only requested a specific attorney but also clearly requested the presence of counsel through the statement on the reverse of attorney Butler's business card. The petitioner argues because he clearly indicated "a desire for the assistance of any attorney in dealing with custodial interrogation by the police," *McNeil v. Wisconsin*, 501 U.S. 171 (1991), the detectives violated his *Miranda* rights by failing to cease interrogation. The magistrate judge agrees and concludes the state court adjudication of this claim was unreasonable as well as erroneous.

11) The primary issue in this claim is whether a reasonable officer in light of the circumstances would have understood the petitioner's statement to be an equivocal or ambiguous request for counsel. *See Davis*, 512 U.S. at 459. The magistrate judge concludes that a reasonable officer would not have found the petitioner's request ambiguous and that because the facts of this case weigh so heavily toward such a conclusion, the state court's determination to the contrary is not the type of decision that the AEDPA shields from federal habeas relief.

12) If a suspect "actually invokes" the *Miranda* right to counsel at any time during custodial interrogation, interrogators must cease further questioning until a lawyer is made available or the suspect himself reinitiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Davis*, 512 U.S. at 458 (quoting *Michigan v. Harvey*, 494 U.S. 344 (1990)). The *Miranda* decision, itself, states:

> If the individual indicates in any manner, at any time prior to or during
> questioning, that he wishes to remain silent, the interrogation must cease. At this

> point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. ...
>
> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to ... counsel.

*Miranda*, 384 U.S. at 474-75.

13)    When interrogators are confronted, however, with a suspect who is less than clear about whether he intends to invoke his right to counsel, the Supreme Court has instructed that interrogators are not required to cease questioning. *Davis*, 512 U.S. at 452. In *Davis*, the suspect stated he *might* want to have counsel present; but, when interrogators sought clarification and asked the suspect whether he was asking for a lawyer or just making a comment about a lawyer, the suspect responded, no, that he was not asking for a lawyer and that he did not want a lawyer. *Id.*, at 455. The Court held that cessation of police questioning was not required. *Id.*, at 462. The Court explained that the interrogators properly disregarded the *Edwards* rule because a suspect bears the burden of invoking his *Miranda* rights. *Id.*, at 461. "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*, at 459 (internal quotations and citation omitted).

14)    The state court reasoned that because the petitioner used the word *might*, the petitioner's request was *ipso facto* an equivocal request and, thus, automatically triggered the

*Davis* exception to the *Edwards* requirement to cease questioning. Thus, by focusing almost exclusively on the use of the term *might*, the state court disregarded other facts surrounding the petitioner's request and unreasonably applied the facts of the case to clearly established federal law.[12]

15)     At the suppression hearing, the testimony proceeded as follows:[13]

    Det. Yates:  When we brought Mr. Yenawine back over to speak with him in the Homicide Office, we were in an interview room.  Det. Phelps and myself, we sat there, and asked Mr. Yenawine – or Det. Phelps asked Mr. Yenawine would he like to tell us what happened.  He sat for a few seconds, and he says, 'I might want to speak with my attorney about it first.'  And he pulled out a small, tattered business card that had Mr. Bill Butler's name on it.  And he was asked, is Bill Butler his attorney?  And he said, 'Yes.'  And we explained to him that Mr. Butler told either Det. Phelps or Brown that he was not his attorney, but he was Wendy – his wife's – attorney.

    Prosecutor:  Now, at that point in time, did Mr. Yenawine say, 'I don't want to talk until I speak to my lawyer?

    Det. Yates:  No sir.  He did not say a word.  He took a deep breath and started to cry a little bit – starting smoking a cigarette.  A couple of minutes passed where basically nothing was said – it was almost dead silent, because he had started to cry and kept shaking his head.  And may have said something about, you know, 'I'm going to miss my kids.'  And then Det. Phelps asked him, 'Well, do you want to talk to us?  Do you want to say anything to us?  And he didn't say anything.  He just sat there and kept shaking his head again.  He said, 'Well, okay.'  And at that point, she started to get the tape recorder together.  And he was like looking at the tape and then Det. Phelps – and I interjected at some point that the reason why we were going on tape was to make sure that we

---

[12] One may argue the Supreme Court of Kentucky considered all the surrounding circumstances given its reference to *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004). However, the majority opinion reflects that a majority of justices concluded that as a matter of law, they were not required to consider other facts. To this end, the majority stated, in full:

> Recently in *Abela v. Martin*, the Sixth Circuit held that a defendant who said that "maybe" he should speak with a specific attorney and handed over that attorney's business card had invoked his right to counsel. We believe *Abela* is wrong and is not binding precedent on this Court. (footnote citation omitted.)

The remainder of the majority's discussion addresses the legal effect of using the term "might." App. at 126.

[13] Respondent's Mem. of Authorities in Support of His Answer, at 9-10.

accurately said or portrayed what he was going to say. We didn't want to write it down and misquote him. That's where it started.

 Prosecutor: And did he agree to do that?

 Det. Yates: Yes, he did.

 Prosecutor: And then once you went on tape – and the court can obviously read the transcript – you read him his rights again, and he waived those rights. Is that accurate?

 Det. Yates: Det. Phelps did, yes.

 Prosecutor: Now, at any point in time prior to going on tape, after this mention about 'I might need to discuss (sic) a lawyer,' did he ever say, 'I want a lawyer.'

 Det. Yates: No, sir, he did not.

 Prosecutor: When you told him that it was your understanding that Mr. Bill Butler represented Wendy and not him, did he ever say, 'Well, I want to talk to Bill Butler?'

 Det. Yates: No, sir, he did not.

 Prosecutor: Did he ever say, 'Well, if that's the case, detective, I want to talk to another lawyer or public defender.'

 Det Yates: No, sir, we did not.

 Prosecutor: At any point in time, from the time you picked him up in Clark County, Indiana, to the time you concluded the second interview with Mr. Yenawine, did you ever make any promises to him regarding leniency, or expectations regarding leniency, if he were to cooperate with the police?

 Prosecutor: No, sir, he did not.

16) The state court did not disregard the surrounding facts and circumstances based on any credibility determination. Instead, it appears that the state court's reasoning, like the prosecutor's questioning, is premised on the proposition that the petitioner was required to speak assertively, not just sufficiently clearly, to invoke his *Miranda* right to counsel. The *Davis*

opinion recognizes, however, the distinction between indecisive suspects and those suspects who actually request an attorney without assertiveness because they are in a custodial setting. *E.g., id.*, at 460-61.

17) Here, the petitioner coupled a verbal request, albeit couched in terms of *might*, with the gesture of handing the detectives a business card that clearly states: "I do not agree to answer any question without my lawyer present." The magistrate judge concludes the petitioner's request for counsel was communicated with sufficient clarity such that a reasonable officer would have ceased questioning. The detective's testimony demonstrates the petitioner's expressed wishes were ignored in contravention of the rights just read to him and the rights asserted on the card, all of which perpetuated an unacceptable atmosphere of intimidation and coercion. Such a conclusion necessarily follows from a reasonable application of the facts to clearly established, Supreme Court precedent. Therefore, the state court's failure to suppress the petitioner's statement for this *Miranda* violation resulted in an unconstitutional conviction.

18) The magistrate judge will therefore recommend that the court grant the writ on the merits of this *Miranda* claim. With this disposition, it is not necessary to address the remaining claims in the petition.

### III. RECOMMENDATION

The magistrate judge concludes that the petition satisfies the conditions in § 2254(d) for granting the writ. Therefore, the magistrate judge recommends that the district court issue a conditional writ of habeas corpus ordering the Commonwealth of Kentucky to release the petitioner unless he is retried in accordance with Supreme Court precedent within one hundred eighty days.

DATE:

cc:  Counsel of Record

### **NOTICE**

Within ten (10) days after being served a copy of these proposed findings of fact, conclusions of law, and recommendation, any party who wishes to object must file and serve written objections, or further appeal is waived. *Thomas v. Arn*, 782 F.2d 813 (6th Cir. 1984); 28 U.S.C. § 636(b)(1)(C). A party may file a response to another party's objections within ten (10) days after being served with a copy thereof.

.007