UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:06CV-413-R

SAMUEL YENAWINE                                                                    PETITIONER

v.

JOHN MOTLEY, WARDEN                                                            RESPONDENT

## MEMORANDUM OPINION

This matter is before the Court upon the petition for writ of habeas corpus filed by the petitioner pursuant to 28 U.S.C. § 2254. The magistrate judge has concluded that the petitioner satisfies the conditions in § 2254(d) for granting the writ and has recommended that the Court issue a conditional writ of habeas corpus ordering the Commonwealth of Kentucky to release the petitioner unless he is retried in accordance with Supreme Court precedent within one hundred eighty days. The Court has conducted a *de novo* review of the magistrate judge's report in light of the objections thereto and the record as a whole. For the reasons discussed below, the Court has determined that the magistrate judge's report should not be adopted.

## BACKGROUND

On January 10, 2001, Louisville, Kentucky, firefighters responded to a house fire and rescued petitioner Samuel Yenawine, his wife and three children from the roof over the front porch of the house. The Yenawines lived on the second floor of the house and operated a business on the first level. Firefighters found the body of Brian Tinnell in the rear of the house, where he lived in an attached but separate apartment. They also found accelerants and a knife near the body. Investigators concluded the fire originated in Tinnell's apartment but that he died of knife wounds rather than by exposure to fire.

On January 14, 2001, Yenawine's wife, Wendy, went to the Louisville Police

Department accompanied by her attorney Bill Butler, where she gave a statement implicating the petitioner in the death of Brian Tinnell and the arson of the house. At that time, Mr. Butler advised Sgt. Brown that he might have a conflict of interest in representing both Wendy and the petitioner.

On January 18, 2001, the grand jury of Jefferson Circuit Court indicted Yenawine on charges of murder and arson.[1] On January 19, 2001, Yenawine voluntarily turned himself into police in Indiana after learning that a bench warrant had been issued for his arrest, and was extradited to Kentucky. Once in custody in Louisville, he was interviewed by Detectives Phelps and Yates of the Louisville Police Department. At the beginning of the taped interview, Yenawine received the following admonition:

> You have the right to remain silent. You have the right to talk to a lawyer prior to any questioning or the making of any statements and to have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed by the court to represent you before any questioning if you desire one. You may stop the questioning or making of any statements at any time by refusing to answer further, or by requesting to consult with an attorney prior to continuing with questioning or the making of statements.

Yenawine responded that he understood the admonition and stated that he wished to make his statement. He then gave the following recorded confession to the homicide detectives, as recounted in an unpublished opinion of the Supreme Court of Kentucky:

> Yenawine told how he and the victim were in the apartment at the back of the building smoking marijuana on the night of the fire. Later that night...Yenawine went upstairs to his bedroom where his wife was asleep. After about an hour or so, Yenawine heard floorboards creaking from the direction of his children's room. He went to investigate and saw Tinnell sneaking out of the room. Yenawine, afraid that Tinnell had molested his children, followed Tinnell downstairs to his apartment. When confronted, Tinnell

---

[1] The indictment was later amended on February 6, 2001, to include charges of wanton endangerment, tampering with physical evidence and being a persistent felony offender.

came at Yenawine with a knife. A fight ensued, and Yenawine stabbed Tinnell six times, and slashed his throat.

Yenawine also described setting the blaze to destroy any evidence of the victim's body. He stated he then showered, returned to bed with his wife, and fell asleep. After being awakened by his wife, Yenawine escaped with his family out the front window on the porch roof.

On January 23, 2002, Yenawine filed a motion to suppress the statements he made to the police officers. During a suppression hearing on February 26, 2003, Yenawine testified that he wanted an attorney present during questioning, and requested counsel prior to giving the recorded confession. Also at the suppression hearing, Detective Yates testified and described the events as follows:

> Prosecutor: During your time, prior to going on tape with Mr. Yenawine, was the name, 'Bill Butler' ever mentioned?
>
> Det. Yates: Yes, it was.
>
> Prosecutor: And if you could explain to the court how that name was mentioned and the conversation transpired.
>
> Det. Yates: When we brought Mr. Yenawine back over to speak with him in the Homicide Office, we were in an interview room. Det. Phelps and myself, we sat there, and asked Mr. Yenawine-or Det. Phelps asked Mr. Yenawine would he like to tell us what happened. And he sat for a few seconds, and he says, 'I might need to speak with my attorney about it first.' And he pulled out a small, tattered business card that had Mr. Butler's name on it. And he was asked, is Bill Butler his attorney? And he said, 'Yes.' And we explained to him that Mr. Butler told either Det. Phelps or Brown that he was not his attorney, but was Wendy-his wife's-attorney.
>
> Trial judge: Wait a minute. Repeat what you just said, sir, so that I am sure to understand it.
>
> Det. Yates: Okay. When he was asked who his attorney was, he just pulled out a business card-tattered business card-that had Mr. Bill Butler's name on it. And Det. Phelps asked him, was Bill Butler his attorney? And he said, 'Yes.' And we explained to him that we were informed that Bill Butler was not his attorney, but he was his wife's attorney-Wendy's.

Prosecutor: Now, at that point in time, did Mr. Yenawine say, 'I don't want to speak until I speak to my lawyer.'

Det. Yates: No, sir. He did not say a word. He took a deep breath and started to cry a little bit-started smoking a cigarette. A couple of minutes passed where basically nothing was said-it was almost dead silent, because he had started to cry and kept shaking his head. And may have said something about, you know, 'I'm going to miss my kids.' And then Det. Phelps asked him, 'Well, do you want to talk to us? Do you want to say anything to us?' And he didn't say anything. He just sat there and kept shaking his head again. He said, 'Well, okay." And at that point, she started to get the tape recorder together. And he was like looking at the tape and then Det. Phelps-and I interjected at some point that the reason why we were going on tape was to make sure that we accurately said or portrayed what he was going to say. We didn't want to write it down and misquote him. That's where it started.

Prosecutor: And did he agree to that?

Det. Yates: Yes, he did.

Prosecutor: And then once you went on tape-and the court can obviously read the transcript-you read him his rights against, and he waived those rights. Is that accurate?

Det. Yates: Det. Phelps did, yes.

Prosecutor: Now, at any point in time prior to going on tape, after this mention about 'I might need to discuss a lawyer," did he ever say, 'I want a lawyer.'

Det. Yates: No, sir, he did not.

Prosecutor: When you told him that it was your understanding that Mr. Bill Butler represented Wendy and not him, did he ever says, 'Well, I want to talk to Bill Butler?'

Det. Yates: No, sir, he did not.

Prosecutor: Did he ever say, 'Well, if that's the case, detective, I want to talk to another lawyer or a public defender.'

Det. Yates: No, sir, he did not.

Prosecutor: At any point in time, from the time you picked him up in Clark County, Indiana, to the time you concluded the second interview with Mr. Yenawine, did you ever make any promises to him regarding leniency, or expectations regarding leniency, if he were to cooperate with the police?

4

>Det. Yates: No, sir, I did not.

The back of Mr. Butler's business card contained the following printed statement:

> My lawyer has told me not to talk to anyone about my case, not to answer any questions and not to reply to any accusations. Call my lawyer if you want to ask me questions. I do not agree to answer any question without my lawyer present. I do not agree to waive any of my constitutional rights.

On March 3, 2003, the trial judge entered an order denying the motion to suppress, ruling that the statements resulted from "custodial interrogation" but that Yenawine stated that he understood his rights and that he voluntarily gave a statement to the police.

On March 4 through 13, 2003, Yenawine was tried before a jury of the Jefferson Circuit Court, which acquitted him of the murder charge but found him guilty of the remaining charges. On March 14, 2003, judgment was entered against him, and he was sentenced to imprisonment for life. From this conviction, Yenawine appealed to the Kentucky Supreme Court. On March 17, 2005, the Kentucky Supreme Court found an error in the jury instructions and reversed Yenawine's arson conviction but affirmed the remaining convictions and sentences. A retrial on the arson charge has yet to occur. Thus, Yenawine is currently serving a ten-year sentence exclusive of the pending arson charge.

## STANDARD

The federal habeas statute, as amended in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides relief from a state conviction if the petition satisfies one of the following conditions:

>...the [state court's] adjudication of the claim-
>
>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This statute further provides that state court determinations of fact are presumed to be correct. § 2254(e)(1).

  The Supreme Court of the United States has taken care to distinguish federal habeas review from review on direct appeal, particularly when the state court articulates the correct legal rule in its review of a claim. In this situation a "federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

  A federal habeas court also may not substitute its evaluation of the state evidentiary record for that of the state trial court unless the state determination is unreasonable. *Rice v. Collins*, 546 U.S. 333, 341-42 (2006) (stating, "Reasonable minds reviewing the record might disagree...but on habeas review that does not suffice to supercede the trial court's credibility determination.").

## DISCUSSION

  28 U.S.C. § 2254(d) provides a petitioner for a writ of habeas corpus relief from a state conviction only if the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The magistrate judge determined that the state court's failure to suppress the petitioner's statement resulted in an unreasonable application of clearly established federal law. The Court, however, does not agree.

**1. Unreasonable Application of Clearly Established Federal Law**

This Court may only issue a writ of habeas corpus to Yenawine if the Supreme Court of Kentucky applied clearly established federal law erroneously or incorrectly and applied that law in an objectively unreasonable manner. "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

In this case, Yenawine claims the state trial court improperly admitted his incriminating statements at trial because police detectives violated his *Miranda* rights during custodial interrogation. At issue, specifically, is whether the petitioner adequately and unequivocally asserted his right to be questioned only in the presence of counsel. If so, the state court's failure to suppress the statement he gave to the police after this *Miranda* violation would result in an unconstitutional conviction.

Under the rule established in *Edwards v. Arizona*, "law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation." *Davis v. United States*, 512 U.S. 452, 454 (1994) (explaining the Court's holding in *Edwards*, 451 U.S. 477 (1981)). The application of the *Edwards* rule "requires courts to 'determine whether the accused actually invoked his right to counsel.'" *Id.* at 458 (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curium)). In doing so, the courts must make an objective inquiry. *Id.* at 458-59.

For an accused to invoke his Miranda right to counsel and force questioning to cease, he must make some statement that can "reasonably be construed to be an expression of a desire for

7

the assistance of an attorney." *Id*. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). However, the police are not required to cease questioning "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Id.* (emphasis in original). The test is an objective one: whether the suspect has "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*.

> In *Davis,* the United States Supreme Court stated:
>
> We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.

*Id.* at 462. Thus, the Court declined "to adopt a rule requiring officers to ask clarifying questions." *Id.* When faced with an ambiguous reference to an attorney, the police may either clarify whether the suspect wants an attorney present or continue the interrogation without asking for clarification. *Id.*

Under AEDPA, this Court is limited to determining whether the state court reached a decision contrary to, or involving an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). "Clearly established federal law under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). The preceding discussion presents what this Court considers "clearly established federal law" at the time the state court rendered its

8

decision as to the petitioner.

### A. The decision of the state court

The state trial court reasoned that Yenawine's statement,"I might need to speak with an attorney," did not clearly and unambiguously state his desire for legal counsel, as required by *Davis*.[2] The trial court also found that it was not improper for the officers to inform Yenawine that Butler was representing Wendy and had a conflict of interest that precluded Butler from representing Yenawine. The court said:

> When given a second opportunity to request legal counsel in the taped statement, Yenawine waived his Sixth Amendment rights and provided a statement. Given all of the factual circumstances, the Court finds that Yenawine knowingly and intelligently waived his right to counsel on January 19, 2001 and the statements will not be suppressed at trial.

On appeal, the Supreme Court of Kentucky agreed and reasoned that under *Davis*, Yenawine's timid, verbal request for counsel fell short of invoking *Miranda's* right to counsel during custodial interrogation. The court concluded that the trial court correctly held that the petitioner failed to make a direct request for counsel and properly admitted the taped confession for the jury's hearing.

In reaching its decision, the Kentucky Supreme Court considered and rejected as non-binding *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004). After recounting the holdings of *Davis*, *Miranda*, and *Edwards*, the court stated that Yenawine's statements fit within the *Davis* rubric. The court stated:

> Yenawine told detectives "I might need to speak with my lawyer about whether I should talk with you," and handed them the business card of his wife's attorney. Recently, in *Abela v. Martin*, the Sixth Circuit held that a defendant who said that "maybe" he should speak with a specific attorney and handed over that attorney's business card had invoked

---

[2]Order of Jefferson Circuit Court, Denying Motion to Suppress.

his right to counsel. We believe *Abela* is wrong and not binding precedent on this Court. Yenawine's statement was not the sort of "unambiguous or unequivocal request for counsel" that would have required the police to stop questioning him.

The Kentucky Supreme Court did not discuss *Abela* in any greater detail, but its facts are admittedly somewhat similar to the facts of Yenawine's case. There, after a fight where Abela stabbed and killed another man, he was taken to the hospital by the police to be treated for his own injuries. *Abela*, 380 F.3d at 918-19. At the hospital, the police began interrogating him about the events leading up to the stabbing. *Id.* at 919. Abela stated "maybe I should talk to an attorney by the name of William Evans" and showed a police officer Evans's business card. *Id.* The officer agreed to call Evans for Abela and left the room, presumably to contact Evans.[3] *Id.* The officer returned but did not mention Evans, and proceeded to read Abela his Miranda rights. *Id.* Abela then signed a form waiving those rights and gave a statement. *Id.* He gave another statement at the police station, and both statements were admitted at trial. *Id.*

The Sixth Circuit distinguished *Abela* from *Davis* by rejecting the "respondent's contentions that the word 'maybe' be viewed in isolation" and that it was dispositive of the question as to whether Abela had invoked his right to counsel. *Id.* at 926. The court stated that the circumstances surrounding his statement were such that "a reasonable officer would have understood" that Abela was "clearly and unequivocally invoking his right to counsel." *Id.* The court reasoned that Abela's use of "maybe" was made clear by the circumstances; he named a specific attorney with whom he wanted to speak, showed the officer the actual business card, and the officer left the room to presumably call that attorney. *Id.* The court said the officer's actions

---

[3] There was some conflict as to how the officer actually retrieved the card and whether he actually called Evans.

10

confirmed that a "reasonable officer would understand Abela's statement to be a clear request for counsel." *Id.*

This Court believes, however, that *Abela* is not "clearly established federal law," as set forth by the United States Supreme Court at the time the state court rendered its decision and sets forth no precedent a court must follow in considering whether to grant a writ of habeas corpus. *See Lockyer*, 538 U.S. at 71. Thus, the Court believes that the Kentucky Supreme Court did not unreasonably apply clearly established federal law in rejecting its holding as precedent binding its decision regarding Yenawine's statements. Instead, the Kentucky court applied the clearly established federal law set forth by *Davis* and its progeny.

Under *Davis*, questioning of an accused must cease only when the accused makes some statement that can "reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis,*. 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). A reference to an attorney that is "ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel" will not suffice. *Id.* (emphasis in original).

Under this standard, it was not unreasonable for the Supreme Court of Kentucky to conclude that Yenawine's statements did not amount to a clear and unambiguous request for counsel that would have forced the officers to cease questioning him. Five days prior to Yenawine's interrogation, Attorney Butler told the police that he may have a conflict of interesting in representing Yenawine. When Yenawine asked for "my" attorney and handed over Butler's business card, he was informed that Butler was not "his" attorney. The police then asked him if he wanted to speak with them or not in light of this information, and Yenawine

replied, "Well, okay."  After being read his rights, Yenawine replied that he understood them, and never expressed any desire for counsel.  Thus, the circumstances surrounding Yenawine's statements reflect that Yenawine's alleged invocation of counsel was not clear and unambiguous.

In the Court's view, it was not an unreasonable application of federal law for the Kentucky Supreme Court to conclude that this scenario falls squarely within the rule of *Davis*. Therefore, there is no basis for concluding that the admission into evidence of petitioner's subsequent statements was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Court notes that this is a close call.  The standard of review mandated by AEDPA is the driving force that causes the Court to reach this conclusion.  The Kentucky Supreme Court identified the correct legal principle of "whether Yenawine had made an ambiguous or unequivocal request for counsel."  The facts leaves enough room to make a strong argument for positive or negative response to that question.  As a trial judge, the Court may have concluded differently.  However, viewing the facts of this case, the Court cannot say the Kentucky Supreme Court's decision was contrary to or amounted to an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.

## CONCLUSION

For the reasons discussed above, the Court declines to accept the magistrate judge's report.  The petition does not satisfy the condition in 2254(d) for granting the writ, and the petition for a writ of habeas corpus is **DENIED.**

An appropriate order shall issue.